UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                           Plaintiff,           15 Civ. 9020

        -against-                               OPINION

DEPARTMENT OF HOMELAND SECURITY,
U.S. CUSTOMS AND BORDER PROTECTION,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
OFFICE OF REFUGEE RESETTLEMENT,

                           Defendants.

------------------------------------------X

A P P E A R A N C E S:


        Attorneys for Plaintiff

        ACLU FOUNDATION IMMIGRANTS' RIGHTS PROJECT
        390 Drumm Street
        San Francisco, CA 94111
        By:  Cecillia Derphine Wang, Esq.

        AMERICAN CIVIL LIBERTIES UNION, WOMEN'S RIGHTS PROJECT
        125 Broad Street
        New York, NY 10004
        By:  Omar C. Jadwat, Esq.

        CARDOZO IMMIGRATION JUSTICE CLINIC
        55 Fifth Avenue
        New York, NY 10003
        By:  Lindsay Cotten Nash, Esq.

Attorneys for Defendants

JOON H. KIM
Acting U.S. Attorney for the Southern District of N.Y
86 Chambers Street, Third Floor
New York, NY 10007
By:  Elizabeth Tulis, Esq.
     Caleb Hayes-Deats, Esq.

**Sweet, D.J.**

Defendant United States Customs and Border Protection ("CBP" or the "Government") has moved for partial summary judgment pursuant to Rule 56 F. R. Civ. P. (Exemptions 6, 7(C), 7(E), and 7(F) of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(6), (7)(C), (E) & (F)) upholding CBP's decision to withhold certain questions and answers put to alien minors suspected of smuggling. The plaintiff American Civil Liberties Union Foundation ("ACLUF" or the "Plaintiff") has cross-moved pursuant to Rule 56, F. R. Civ. P. to compel release of documents redacted by CBP and to compel U.S. Immigrations and Customs Enforcement ("ICE") and the Office of Refugee Resettlement ("ORR") to respond to the ACLUF's FOIA requests.

Based upon the facts and conclusions set forth below, the CBP motion is denied in part and granted in part and the ACLUF motion is granted in part and denied in part with leave granted to renew.

**Prior Proceedings**

1

On November 25, 2014, the ACLUF filed an FOIA request seeking "[a]ll records relating to the Juvenile Referral Program ('JRP')." The JRP was pilot program implemented by CBP to deal with the exploitation of juveniles by criminal organizations along the border between the United States and Mexico. The CBP determined that criminal organizations used unaccompanied alien children ("UACs") from Mexico to smuggle aliens and narcotics, expecting that authorities in the United States would not prosecute the juveniles and would instead allow them to voluntarily return to Mexico. Under the JRP, CBP stopped permitting Mexican UACs who were suspected of smuggling to voluntarily return to Mexico, and instead referred them to the ORR. The procedures applied by the JRP parallel CBP's procedures for UACs from non-contiguous countries. The JRP differed from CBP's procedures for UACs from non-contiguous countries to the extent that, because CBP by definition suspected the minors in the JRP of having committed a crime, its referrals to ORR generally requested secure placement. CBP terminated the JRP in September 2015.

On July 22, 2015, CBP produced 113 pages of records in response to the ACLUF's request. On July 30, 2015, Plaintiff administratively appealed the July 22, 2015, response, arguing

2

that the response had not included existing documents that fell
within the scope of the request.

On November 17, 2015, Plaintiff filed the instant
suit. Three days later, the ACLUF filed a second FOIA request
that updated its November 25, 2014, request by seeking all
documents relating to the JRP from between November 26, 2014,
and November 20, 2015. The ACLUF subsequently amended its
complaint to incorporate the November 20, 2015, request into
this suit.

During the course of this lawsuit, CBP has produced
over 1,000 pages of documents concerning the JRP. These
documents include internal memoranda describing the JRP,
retrospective analyses of the JRP's effectiveness, presentations
explaining the JRP to CBP officials, forms associated with the
JRP, standard operating procedures, correspondence with legal
service and advocacy organizations concerning the JRP, internal
emails about individual aliens processed through the JRP (with
identifying information redacted), and the memorandum announcing
the termination of the JRP. CBP has also provided spreadsheets
that contain limited information about every alien minor
processed through the JRP, including his or her country of

3

birth, age, gender, date of arrest, processing disposition, incidents of recidivism, time in CBP custody, and type of placement with ORR.

Certain documents produced by CBP contain a list of questions that CBP poses to minors suspected of smuggling, together with the minors' answers to those questions. These questions and answers appear in different types of documents, including forms entitled "Unaccompanied Alien Child (UAC) – JRP Secure Placement Referral Form," and emails sent by CBP officials.

The material redacted consists of twenty-five to thirty questions that CBP routinely asks in order to elicit information about smuggling and other criminal activity in which the minor and others may have engaged. CBP has also redacted the minors' answers to those questions.

After CBP redacted the interview questions and the accompanying answers from the documents it produced, ACLU challenged those redactions. Despite negotiating in good faith over the appropriateness of the redactions, the parties failed to reach agreement.

4

The instant motion and cross-motion were heard and
marked fully submitted on October 27, 2016.

**The Facts**

The facts are set forth in the July 22, 2016
declarations of Shari Suzuki ("Suzuki"), the September 19, 2016
Declaration of Fernando Pineiro ("Pineiro") and the Supplemental
Declaration of Shari Suzuki ("Suzuki Supp."), the September 16,
2016 Declaration of Kimberly N. Epstein ("Epstein") submitted on
behalf of CBP and the Plaintiff's Statement pursuant to Local
Civil Rule 56.1.

The Declarations submitted by CBP include the
following facts.

The examples of documents submitted by CBP demonstrate
that CBP has not redacted all indications of the types of
information it attempts to obtain from minors suspected of
smuggling and reflect that CBP records the minors' names,
aliases, apprehension date, tattoos, and affiliation with any
criminal organization, behavioral issues, and prior criminal

5

history. The redactions challenged by the ACLU consist of
twenty-five to thirty questions that CBP routinely asked as part
of the JRP in order to elicit information about smuggling and
other criminal activity in which the minor and others may have
engaged. ACLUF has also challenged CPB's redaction of the
minors' answers to those questions.

The questions in the JRP forms, which CBP routinely
poses to minors it suspects of smuggling, themselves constitute
a technique CBP uses to investigate smuggling and crimes related
to the exploitation of minors. This technique was devised in
order to elicit information regarding the affiliations between
the suspected juvenile smugglers and each other, criminal
organizations, and gangs, as well as information about their
modus operandi. Exemption (b)(7)(E) has been applied by CBP to
protect the law enforcement techniques used in questioning
suspected juvenile smugglers of humans or illegal drugs and
deciding how to respond and ask follow-up questions based on the
answer elicited. Some of the information withheld presents
situational responses, instructing the questioner that, "if a
reply is received, then the b follow-up may be required because
of x, y, and z considerations." Even though CBP has terminated
the JRP, it continues to use these interview questions, as well

6

as other similar questions that explore related topics, in carrying out its law enforcement responsibilities.

Although the public is aware that suspects are questioned or interrogated following detention or arrest, the Government asserts that the specific questions and the actual questioning techniques are not generally known to the public. Release of this information could facilitate circumvention of the techniques and procedures related to the interrogation of juvenile smugglers who have been apprehended or detained while smuggling people or drugs into the United States. Criminal organizations exploiting juveniles could coach them on how to respond to CBP's questions and how to avoid providing information that might prove useful to CBP.

The specific questions and follow-ups in the JRP forms, which CBP routinely poses to minors it suspects of smuggling, might constitute a technique and procedure that CBP uses to investigate smuggling and crimes related to the exploitation of minors. The Government asserts that these questions and follow ups were devised in order to elicit information regarding the affiliations between and among the suspected juvenile smugglers, criminal organizations, and gangs,

7

as well as information about their modus operandi. Some of the information withheld presents situational responses, instructing the questioner that, "if a reply is received, then the b follow-up may be required because of x, y, and z considerations." Although CBP has terminated the JRP, it continues to use these interview questions, as well as other similar questions that explore related topics, in carrying out its law enforcement responsibilities. The specific set of questions and follow-ups used in the JRP is not generally known to the public.

In challenging CBP's invocation of Exemption (b)(7)(E), the ACLU cites clips from the television series "Border Wars." However, the Government asserts that none of the clips cited depicts the specific set of questions and follow-ups utilized by CBP in the JRP.

Release of the information could facilitate circumvention of the techniques and procedures related to the interrogation of juvenile smugglers who have been apprehended or detained while smuggling people or drugs into the United States. If the specific list of questions and follow-ups were made public, criminal organizations exploiting juveniles could more effectively coach them on how to respond to CBP's questions and

8

how to avoid providing information that might prove useful to CBP.

This set of questions and follow-ups — including the particular terminology used, the order of questions, and the directions for situational follow-ups — was carefully calibrated, based on intelligence and prior experiences and observations of smuggling activities at the border, to elicit specific information from the juveniles interviewed as part of the JRP. The particular information the questions and follow-ups were designed to elicit includes both information that would shed light on the smuggling operations and trafficking operations, and information that would help CBP understand the abuse and exploitation to which juvenile smugglers are often subject.

The Office of Refugee Resettlement ("ORR") is part of the Administration for Children and Families ("ACF"), which is an operating division of HHS. ACF has jurisdiction over FOIA requests seeking records originating within ACF.

The only withholding by ACF challenged in the ACLU's pending motion is the redaction, pursuant to FOIA Exemption

9

(b)(5), of portions of the JRP Memorandum dated May 4, 2015, which was originally produced to the ACLU on February 19, 2016. The ACLU challenged the redaction of portions of the "Overview" section of the JRP Memorandum. On September 16, 2016, via counsel, ACF produced to the ACLU a reprocessed version of the May 4, 2015, JRP Memorandum. In the reprocessed JRP Memorandum only three sentences remain redacted in the "Overview" section. The remaining redactions are found in the sections titled "Issues" and "Recommendations."

ACF's searches, processing, and productions of ORR records in response to the ACLU's FOIA request are not yet complete.

Because ACF's searches, processing, and productions are not yet complete, this declaration addresses only the ACLU's challenge to ACF's withholding, pursuant to Exemption (b)(5), of certain information in the JRP Memorandum dated May 4, 2015 (the "JRP Memorandum").

Exemption (b)(5) exempts from disclosure: "inter-agency or intra-agency memorandums or letters which would not be

10

available by law to a party other than an agency in litigation
with the agency."

The JRP Memorandum sets forth recommendations from the
ACF Assistant Secretary to the HHS Acting Deputy Secretary
regarding potential policy decisions related to the JRP process.
The information redacted pursuant to Exemption (b)(5) in the JRP
Memorandum, including the three sentences that remain redacted
in the "Overview" section, consists of opinion, analysis and
recommendations from the ACF Assistant Secretary to the HHS
Secretary regarding the JRP process, including staff opinions
and proposals about the JRP program. The content of the redacted
portions of the memorandum has not been adopted by any decision
maker.

The Plaintiff's Statement set forth the following
facts.

CBP is a component of the Department of Homeland
Security that conducts enforcement at the United States border
with Mexico. The ORR is a component of the Department of Health
and Human Services ("DHS") and is charged with the care and
custody of unaccompanied immigration minors who DHS prosecutes

11

in immigration court. ICE is a component of DHS which (among other things) prosecutes removal cases in immigration court.

In May 2014, CBP developed a program called the Juvenile Referral Program ("JRP").

CBP developed this program out of frustration with the refusal of criminal prosecutors to prosecute Mexican children for guiding migrants across the border.

The JRP implemented "a strict enforcement policy with regard to juvenile involvement in smuggling crimes" that sought to "maximize consequence delivery" to these children.

The standard operating procedures ("SOPs") for the JRP required agents to follow a procedure that differed from the procedure followed for other children.

The SOPs directed agents to cease returning children suspected of being guides or smugglers to Mexico, as was their prior practice, directed agents to interview these children in a way that elicits inculpatory statements, and directed agents to

12

add these children to law enforcement databases to track the children as smugglers/guides.

The SOPs directed agents to refer these children for criminal prosecution by federal or local prosecutors. Further, the SOPs mandated that, when criminal prosecution was declined, agents must initiate deportation proceedings and transfer these children to ORR.

The SOPs mandated that, when transferring the child, agents must submit a "JRP Secure Placement Referral Form" containing some or all of the interview questions and answers as justification for secure placement.

The SOPs also directed agents to ensure that "ensure that the juvenile fully understands that he/she has committed a crime."

Children who were in the JRP reported that this latter direction was effected by CBP agents making sure that the children understood that they were being punished for serving as foot guides. Some children in the JRP reported that CBP agents were physically and verbally abusive as well.

13

Detention for children in the JRP differs from the process for non-JRP children. Unaccompanied children in ORR care (who are not in the JRP) spend, on average, 34 days in ORR care. The majority of unaccompanied children in ORR care generally are housed during that time at residential shelters, the "least restrictive" form of ORR custody.

Ninety percent of unaccompanied children in ORR care are released to a guardian or sponsor.

Unaccompanied children in the JRP are detained for noticeably longer periods of time than unaccompanied children not in the JRP. Children in the JRP were detained for an average of three months. In a number of cases, children in the JRP were detained for twelve to eighteen months.

The DHS is slow to file the charging documents that trigger the commencement of immigration court proceedings in JRP cases.

Children in the JRP were often detained in high-security facilities (secure or staff-secure). Detention in high-

14

security facilities is highly restrictive and in some cases similar to jail. Some secure facilities simultaneously function as juvenile jails.

There is no process through which children can challenge CBP's allegations in the Secure Placement Request. There is no meaningful mechanism through which children can challenge CBP's conclusion that they should be detained. There is no process through which children have been able to seek release on bond.

In immigration court, ICE uses these statements from the interviews that CBP conducts with these children to oppose these children's requests for relief from deportation or voluntary departure. In particular, ICE uses these statements to argue that these children are perpetrators of trafficking, not victims, and should be considered ineligible for relief for victims of trafficking.

Legal service lawyers who represent children detained at secure detention facilities learned about the JRP because they saw references to the JRP on their client's documents and began receiving reports that CBP agents told children that they

15

were being punished for their role as foot guides. Advocates began to seek information from CBP, including by seeking analyses and meetings. CBP refused to provide any information about the JRP and declines to meet about the JRP until it decided to terminate the program.

CBP announced that it was undertaking a review of its screening process generally in response to an OIG report that found that CBP screening of unaccompanied immigrant children generally was deficient in a variety of aspects.

CBP rejected advocacy organizations' requests to participate in the revision to the process it uses when apprehending unaccompanied Mexican minors.

CBP gave conflicting statements on whether it intended to prospectively use practices from the JRP or incorporate them in its attempt to revise the process for screening unaccompanied minors.

On August 8, 2015, CBP officially "concluded the pilot [JRP] program."

16

A memorandum issued in September 2015 ending the pilot program ordered agents to "no longer refer to the 'Juvenile Referral Process' or JRP" on any processing documents, referral forms, in tracking sheets, or in intelligence. CBP did not direct its agents to stop using the practices that characterized the JRP.

CBP explicitly directed agents to continue using the process prospectively on a "case by case basis."

Following these directives, CBP agents have continued to refer children to ORR in the same manner as under the JRP except without using the term "JRP."

After the instant litigation was filed, CBP began producing samples of emails from CBP agents to the "JRP Inbox" and the attachments that accompanied those emails.

The JRP Inbox is an email listserv through which CBP refers JRP children to ORR and requests that the children be placed in high-security, restrictive detention.

17

In the emails sent to this inbox and/or the attachments to those emails, CBP agents include information about why they are requesting high-security placement.

The emails and the attachment contain, as "justification" for secure placement, a list of questions asked by CBP agents and the child's answers or a form entitled "Unaccompanied Alien Child ("UAC") - JRP Secure Placement Referral Form," that contains the questions and answers.

In some instances, the BP agents emailed a Form 93 to the JRP inbox.

A Form 93 is used for screening unaccompanied minors to determine whether they have a fear of return such that they cannot be deported to their home country without a hearing.

CBP applied blanket redactions to withhold all questions and answers in the emails and the Secure Placement Referral Forms without segregation.

CBP applied blanket redactions to withhold answers in Form 93s without segregation.

18

CBP has withheld the questions and answers pursuant to Exemption 7(E), which covers law enforcement techniques. The "technique" CBP describes consists of asking questions and asking follow-up questions. CBP has not claimed that this "technique" requires any special skills or training.

This "technique" has allegedly been portrayed on television and videos online as well as in online and print news reports. Specifically, this "technique" has allegedly been shown in numerous episodes of "Border Wars."

In the "Border Wars" series, CBP agents were filmed apprehending and interrogating suspected foot guides and smugglers, some of which were children. "Border Wars" shows many unique details about the people who are apprehended by CBP, including their bodies, hair, voices, and clothes. CBP publicized "Border Wars," which is widely available online.

More than 800 Mexican children know these questions. Over 500 of these children have been returned to Mexico. Many of the children who were in the JRP resumed their guiding and smuggling activities upon return to Mexico.

19

ICE attorneys have given copies of Secure Placement
Referral forms with the questions and answers to at least one
lawyer who represented children in the JRP.

CBP has already released many of the "unique" details
it now claims are identifying.

Plaintiff submitted a FOIA request to ORR seeking
records related to the JRP on September 10, 2015. ORR did not
respond within the statutory timeframe. Plaintiff filed suit
against ORR. ORR has not completed production of responsive
documents. Plaintiff has identified responsive documents that
ORR did not produce.

ORR also withheld, as relevant to this motion,
portions of one of the documents under Exemption 5.

Plaintiff submitted a FOIA request to ICE seeking
records related to the JRP on September 10, 2015. ICE did not
respond within the statutory timeframe. Plaintiff filed suit
against ICE. ICE has not completed production of responsive
documents. Plaintiff has identified responsive documents that

20

ICE did not produce. ICE also withheld, as relevant to this motion, seven pages on the ground that that redacted information is "non-responsive."

**The Applicable Standard**

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine issue of material fact.*" *Anderson*, 477 U.S. at 247-48 (emphasis in original).

FOIA generally requires federal agencies to make documents and other material "available to the public," see 5 U.S.C. § 552(a), but specifically exempts nine different categories of information from that requirement, see id. § 552(b). Congress adopted this structure "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-147 at 6 (1966), reprinted in 1966 U.S.C.C.A.N. 2418, 2423). The nine exemptions to FOIA's disclosure requirements reflect Congress's determination that "public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). Accordingly, CBP may properly withhold information that falls within any of the nine exemptions. *Id.*

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009). Under Federal Rule of Civil Procedure 56(a), a "court shall

grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." When resolving FOIA
claims, courts first consider whether the agency has made
"reasonable efforts to search for the records" requested by the
plaintiff. 5 U.S.C. § 552(a)(3)(C); accord *Carney v. DOJ*, 19
F.3d 807, 812 (2d Cir. 1994). If an agency locates responsive
records, but withholds them under FOIA's exemptions, courts then
consider whether they fall within one or more of FOIA's
exemptions. See 5 U.S.C. § 552(a)(4)(B); accord *Carney*, 19 F.3d
at 812.

An agency can satisfy its burden on a motion for
summary judgment by submitting a declaration that (1) supplies
"facts indicating that the agency has conducted a thorough
search" and (2) gives "reasonably detailed explanations why any
withheld documents fall within an exemption." *Carney*, 19 F.3d at
812. The agency's declaration is "accorded a presumption of good
faith," and discovery is "unnecessary if the agency's
submissions are adequate on their face." *Id.* (internal quotation
marks omitted); accord *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir.
2009).

23

At this juncture, the ACLUF does not challenge the adequacy of the CBP's search, but only the decision to withhold the interview questions and answers under Exemptions 6 and 7(C), (E), & (F). CBP can satisfy its burden on a motion for summary judgment by providing "reasonably detailed explanations why any withheld documents fall within an exemption." *Carney*, 19 F.3d at 812.

## The CBP Motion to Exempt Questions and Answers Under Exemption 7(E) is Denied

According to CBP the redaction of the questions and answers is permitted under Exemption 7(E) which permits CBP to redact information that would "disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E). The Second Circuit has interpreted the phrase "techniques and procedures" to refer to "how law enforcement officials go about investigating a crime," *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 680-81 (2d Cir. 2010). The issue presented is whether the questions posed to the UAC constitute a technique and procedure. Since disclosing the answers elicited would reveal the interview questions, and the Exemption 7(E) also related to the answers.

24

According to the CBP, while Exemption 7(E) generally covers "investigatory records that disclose investigative techniques and procedures not generally known to the public," *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985), "even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004); see also *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014). Where disclosure would reduce or nullify the effectiveness of investigative techniques and procedures, Exemption 7(E) provides "categorical protection," which means that it does not require any "demonstration of harm or balancing of interests." *Keys v. Dep't of Homeland Sec.*, 510 F. Supp. 2d 121, 129 (D.D.C. 2007) (internal quotation marks omitted).

The Second Circuit has explained that, as used in Exemption 7(E), a "technique" is "a technical method of accomplishing a desired aim" and a "procedure" is "a particular way of doing or going about the accomplishment of something." *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d at 682. But Exemption 7(E) only protects techniques and

25

procedures "not generally known to the public." *Doherty v. United States Dep't of Justice*, 775 F.2d 49, 52 n. 4 (2d Cir. 1985). Accordingly, to invoke Exemption 7(E) here, the agency must justify its assertion that its practice of asking the questions at issue in this motion actually shows a "technique" or "procedure" and that it is not already known to the public.

The CBP argues that questions asked of JRP candidates may be withheld under Exemption 7(E) because they disclose "techniques to 'elicit information regarding affiliations between suspected smugglers and each other, criminal organizations, and gangs, as well as about their modus operandi.'" The Government also asserts that the questions reveal "situational responses" that CBP officials may use to follow up on the answers in order to obtain additional information." A list of questions and some possible follow-up questions is, according to CBP, a "technique."

However, the CBP has cited no case in which interviews like the ones at issue here have been withheld under this exemption. Instead, it cites cases involving polygraph examinations, (citing *Piper v. U.S. Dep't of Justice*, 294 F. Supp.2d 16, 30 (D.D.C. 2003) and *Perrone v. FBI*, 908 F. Supp.

26

24, 28 (D.D.C. 1995)) and a case involving passenger screening
at airports (*Bishop v. Department of Homeland Security*, 45 F.
Supp. 3d 380 (S.D.N.Y. 2014)). Neither context is comparable.
Polygraph questions are administered by certified examiners who
use questions arranged in particular patterns designed to
produce physiological responses, see Plaintiff's Opposition
Brief ("Oppn. Br."), Ex. 12 (excerpt from National Academy of
Science, The Polygraph and Lie Detection (2003)).

Similarly, in *Bishop*, the redactions at issue shielded
from disclosure "which databases CBP considers in its targeting
process and how such information can lead to the triggering of
additional security screening." *Bishop*, like the polygraph cases
(and the tax examiner example used in *Allard K. Lowenstein Int'l
Human Rights Project*), permitted agencies to withhold certain
techniques used internally by agencies when, even after those
techniques were applied, the target did not know how the
technique worked. *Bishop* involved a challenge to the redaction
of different types of information. First, it involved redacted
data fields, a complex system to query multiple databases and
track individuals. *Bishop*, 45 F. Supp. 3d at 388-92. Second, it
involved secondary inspection and "Automated Targeting System"
database records, the revelation of which would not only show

27

how law enforcement database bases worked, but would also show
how CBP uses this technology to determine which of the many
travelers in airports should be subject to additional screening.
*Id.* at 390-91, 93.

The cases cited by CBP also included those which
involved questions in polygraph examinations or methods used to
ferret out fraud or terrorism from otherwise innocuous conduct,
see, e.g., Am. *Immigration Lawyers Ass'n v. DHS*, 852 F. Supp. 2d
66, 77 (D.D.C. 2012) (involving questionnaire filled out by site
inspectors to "document[] their personal observations" that was
a "probing internal assessment sheet used to ferret out
legitimacy of the H-1B" visa relationship, see *id.*, 10-cv-01224,
Dkt. 25, Ex. 5 at 105); *Asian Law Caucus v. DHS*, No. 08-cv-842,
2008 WL 5047839, at *5 (N.D. Cal. Nov. 24, 2008) (involving
question topics asked in screening known or suspected terrorists
attempting to enter the United States and noting fact-specific
nature of decision based on in-camera review.

Here, CBP has not established that there is anything
technical about the questions asked, that any special method or
skills are being used, or that children who were subjected to
questioning would not thereby learn the "technique" that CBP

28

wishes to keep secret. See Defs.' Mot. at 11- 12; Suzuki ¶¶ 26-29. It offered nothing more than the fact that these records would reveal that CBP asks questions about these topics and may ask follow-up questions. *Id.* Courts require the government to offer more than "generic assertions" and "boilerplate" to justify Exemption 7(E) withholding, *ACLU v. Office of the Dir. of Nat'l Intelligence*, 10 Civ. 4419, 2011 WL 5563520, at *11 (S.D.N.Y. Nov. 15, 2011), and the Government has not met its burden here. See *Albuquerque Pub. Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 857 (D.D.C. 1989) (rejecting the government's invocation of Exemption 7(E) where there was "nothing exceptional or secret about the techniques it described.").

In opposition to the ACLUF's cross-motion, an agency lawyer who heads CBP's FOIA appeals office in Washington, D.C. has affirmed that the terminology used and order of questions are "carefully calibrated," based on "intelligence" and "experiences" and "observations." (Suzuki Supp. ¶ 10). There is no evidence submitted with respect to formulating the questions, observation of that process or any intelligence and experience which caused its creation, the relevance of the order of the questions, or the context in which it is used.

Asking well-known law-enforcement arrest questions in a particular order does not amount to a "technique." Section 7(E) requires that the material being withheld truly embody a specialized, calculated technique or procedure and that it not be apparent to the public. In *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010) it was held that a "predominantly internal" memorandum containing specific ranking criteria showing how the Department of Homeland Security chose targets for enforcement and sources for leads would reveal techniques or procedures within the meaning of Exemption 7(E). *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 603 F. Supp. 2d 354, 364-65 (D. Conn. 2009).

Here, CBP officers question children who were already arrested, and do so to get information in response to questions, necessarily revealing the questions to the hundreds of children.

An issue remains as to whether or not CBP has rebutted the substantial evidence showing that these questions are indeed "generally known to the public." *Doherty v. DOJ*, 775 F.2d 49, 52 (2d Cir. 1985). The evidence in support of the ACLUF cross-motion establishes that routine questioning by law enforcement agents is well known, including through filmed arrests and

30

questioning of smugglers that CBP itself made available to anyone with television or internet access. CBP has itself disclosed one question in its script: "Do you know that it's illegal to smuggle/guide subjects into the United States?" Suzuki Ex. A at 1.

The specific JRP questions are known by the children whom CBP already questioned, including the more than 500 who are now back in Mexico, as well as lawyers to whom the Government provided copies of interviews. Pl.'s Stmt. ¶¶ 73-76. CBP contends that the ACLUF cannot prove that these children remembered each question asked. Defs.' Opp'n at 4. However, it can be assumed that some children would remember and report these questions to former (or perhaps current) employers upon return to Mexico. Cf. See *Kubik v. Bureau of Prisons*, 10-cv-6078, 2011 WL 2619538, at *11 (D. Or. July 1, 2011) (finding that riot response technique was generally known and therefore not protected by Exemption 7(E) without requiring the plaintiff to demonstrate that the inmates who saw the riot response remembered the technique).

Relying on decisions from district courts in other circuits, the CBP seeks to narrow the *Doherty* rule, arguing that

31

even "generally known" techniques and procedures may be withheld if disclosure would nullify their effectiveness. Defs.' Opp'n at 3. CBP has cited two cases from this district, *Bishop v. DHS*, 45 F. Supp.3d 380, 391 (S.D.N.Y. 2014) which relied on district court decisions from other circuits, and the second is *Platsky v. NSA*, No. 15 Civ. 1529, 2016 WL 3661534, at *1 (S.D.N.Y. July 1, 2016), a national security case litigated by a pro se plaintiff, which relied on *Bishop*. Neither plaintiff disputed the "nullify the effectiveness" rule CBP advances here, Defs.' Mot. at 10.

However, the Second Circuit has not adopted that exception. Here, ACLUF contends that the 57-episode Border Wars series documents the questions CBP asks smugglers, see Pl.'s Stmt. ¶¶ 67-72, and that to the extent that CBP contends that disclosing the questions to Plaintiff would nullify their effectiveness because they may become known to smugglers, the damage been done, in large part on CBP's own initiative.

Because the CBP has not established that the questions employed a specialized, calculated technique, Exemption 7(E) does not apply.

**The CBP Motion to Bar Questions and Answers under Exemptions 6, 7(C) and 7(F) is Granted**

The ACLUF has conceded the applicability of Exemptions 6, 7(C) and 7(F) (Pltf. Reply Memo p. 7). According to the ACLUF, the only issue is as to the number of border crossings, of citizens brought across the border and details relating to the conclusion that reference to secure placement is required. *Id.*

Having concluded that the 7(E) exception is not applicable, after a review of the questions and answers, the parties will meet and confer with respect to the applicability of the privacy exemptions. In the event a resolution is not reached, the parties are granted leave to renew the instant motions.

**The Relief with Respect to the Form 93 and ORR and ICE Production is Denied**

The CBP has indicated that it intends to make further disclosures with respect to Form 93 and that ICE and ORR searches have not been completed. Any issues remaining after these events have been concluded can be the subject of renewed motions.

33

**Conclusion**

The CBP motion for summary judgment with respect to Exemption 7(E) is denied and with respect to Exemptions 6, 7(C), 7(F) is granted. The ACLUF motion for summary judgment with respect to Exemption 7(E) is granted and denied with respect to Form 93, and the ORR and ICE production.

It is so ordered.

**New York, NY**

**March** 2017

ROBERT W. SWEET
U.S.D.J.

34